FILED
OCT 2 7 2017
[signature] CLERK

UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| UNITED STATES OF AMERICA, | 3:16-CR-30176-RAL |
|---|---|
| Plaintiff, | |
| vs. | OPINION AND ORDER ADOPTING REPORT AND RECOMMENDATION |
| ROBERT DUWAYNE SPAID, | |
| Defendant. | |

Defendant Robert Duwayne Spaid moved to suppress evidence seized from his person, vehicle, and home as a result of a traffic stop. Doc. 37. Magistrate Judge Mark A. Moreno conducted an evidentiary hearing and then recommended denying Spaid's motion. Doc. 54. Spaid has now objected to that recommendation. Doc. 58.

This Court reviews a report and recommendation under the statutory standards found in 28 U.S.C. § 636(b)(1), which provides in relevant part that "[a] judge of the [district] court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). Having conducted a de novo review, this Court adopts the report and recommendation in full.

I. Facts

On the afternoon of October 27, 2016, Deputies Christopher Gross and Dalton Sack of the Hughes County Sheriff's Office were riding together on patrol in Pierre, South Dakota. T. 10. Shortly before 4:30 p.m., Deputy Gross observed Spaid's pickup truck parked outside 1720

1

East Capitol Avenue, a suspected drug house. T. 10, 29, 34, 73. Deputy Gross knew Spaid, having arrested him for using drugs twice before. T. 34–35. The deputies parked their car and waited between five and ten minutes before Spaid left the house and got in his truck. T. 10. He drove east on Capitol Avenue and the deputies followed. T. 10.

Spaid stopped at the intersection of Capitol Avenue and Garfield Street. T. 11; Ex. 3 at 16:32:15. When Spaid did so, the deputies observed that the driver's-side wheels of Spaid's truck were to the left of the center line on Capitol Avenue. T. 59–60, 73.[1] Without using a signal, Spaid made a left-hand turn onto Garfield Street so that he was headed north. T. 11–12; Ex. 3 at 16:32:20–26. Garfield Street is a four-lane highway with two north and two south bound lanes divided by a continuous turning lane. T. 11–12. Spaid was driving in the left north-bound lane. Ex. 3. As the officers followed, they observed two occasions when the driver's side wheels of Spaid's truck crossed the center line that marked the turning lane. T. 13, 24, 61, 74.

Deputy Sack activated the patrol car's overhead lights, signaling Spaid to pull over, but Spaid continued driving. T. 74. As he did, the deputies could see Spaid looking at them in his driver's side mirror. T. 13, 62, 74. Although South Dakota law requires that drivers pull over to the right-hand side of the road and stop when a police car approaches with its lights flashing, S.D. Codified Laws (SDCL) § 32–31–6, Spaid continued traveling in the left lane for approximately thirty-two seconds before he made a left-hand turn and stopped in a space at the Runnings Farm and Fleet parking lot. T. 61; Ex. 3 at 16:33:20–52.

Deputy Sack approached Spaid's truck and asked him for his driver's license, proof of insurance, and vehicle registration. T. 74–75. Spaid provided his license and registration, but

---

[1] Although Capitol Avenue's center line is worn away and difficult to identify on the video of the traffic stop, Deputy Gross testified that the center line was still visible to the naked eye. T. 59–60, 70–71.

2

was unable to provide proof of insurance. T. 74–75. At Deputy Sack's request, Spaid accompanied Sack to his patrol car. T. 76; Ex. 3 at 16:35:47. Deputy Sack asked Spaid where he was coming from, and Spaid replied that he was coming from the courthouse. T. 75; Ex. 3 at 16:36:24–16:37:24. Spaid denied having any contraband in his truck and declined Deputy Sack's request to search it. Ex. 3 at 16:37:29–34.

Concerned that Spaid was impaired, Deputy Sack, who was new to the job and not yet fully trained, exited the patrol car and asked Deputy Gross to take over. T. 76, 85–86; Ex. 3 at 16:37:56. Deputy Gross joined Spaid in the car for approximately six minutes, during which he performed two eye-related field sobriety tests on Spaid and asked Spaid some questions about his insurance, what he was doing that day, and whether he had used any drugs or alcohol. Ex. 3 at 16:38:30–16:44:30. During the conversation, Spaid said that he had "just came from the courthouse;" when Deputy Gross asked "Just now?" Spaid replied "Yes." Ex. 3 at 16:39:49–59. Although Spaid denied using any drugs or alcohol, one of the sobriety tests showed a lack of right-eye convergence, which Deputy Gross testified is an indicator of marijuana use. T. 17, 50; Ex. 3 at 16:40:50–16:41:05.

While Deputy Gross was speaking with Spaid in the patrol car, Deputy Sack walked up to the driver's side window of Spaid's truck. T. 76; Ex. 3 at 16:38:39–43. The window was down and there was a small dog in the truck that had been barking throughout the stop. T. 76–77. Without leaning his head inside the truck, Deputy Sack reached his hand through the truck's open window to pet the dog. Ex. 3 at 16:38:42–16:39:22. From this position, while reaching in to pet the dog, Deputy Sack saw what he suspected was the mouth piece of a marijuana pipe sticking out from underneath the truck's center console. T. 76–77, 81, 92; Ex. 3 at 16:38:39–16:39:24; Ex. 11 at 11, 19. As Deputy Sack pet the dog, Deputy Darin Johnson arrived at the

3

scene to assist. T. 77, 84; Ex. 3 at 16:39:07. Deputy Sack asked Deputy Johnson to confirm what he had seen in the truck. T. 77, 84. As both deputies looked in the driver's side window, they observed a "dugout"[2] laying on the driver's seat. T. 18, 77; Ex. 3 at 16:39:22–16:40:10. Although Deputy Sack had seen the dugout when he first saw the pipe, he did not know what it was. T. 78.

Deputies Sack and Johnson walked back to the patrol car and told Deputy Gross that they had seen a marijuana pipe in Spaid's truck. T. 17; Ex. 3 at 16:44:04–30. Deputy Gross looked in the driver's side window himself and was able to see the marijuana pipe and the dugout. T. 17–18, 68. The deputies then searched Spaid's truck and placed him under arrest. T. 19; Ex. 3. They found a .22 caliber rifle in Spaid's truck as well as some marijuana and cash. T. 69; Ex. 11 at 37; Exs. 2, 4. An inspection of the dugout revealed that it contained marijuana, and the deputies found a "one-hitter" pipe on Spaid's person. T. 19, 69; Ex. 11 at 37; Exs. 2, 4.

Based on the information obtained from the traffic stop, law enforcement officers obtained and executed a search warrant on Spaid's residence. They seized drug paraphernalia, 12-gauge shotgun shells, and some .22 caliber rounds. Shortly thereafter, a federal grand jury indicted Spaid for being a felon in possession of a firearm and ammunition. Spaid also was indicted in state court on drug charges. Doc. 39-2. A state court judge suppressed the evidence seized from Spaid's truck, concluding that the deputies lacked reasonable suspicion for a traffic stop. Doc. 39-2.

## II. Spaid's factual "clarifications"

Spaid asserts that although Judge Moreno's factual findings are "generally accurate, a few facts were omitted and/or not fully described." Doc. 58 at 2. Only two of Spaid's "factual

---

[2] As Judge Moreno explained, a "dugout" is a small wooden box designed to carry marijuana and a cigarette-size pipe for smoking it. Doc. 54 at 4; see also Ex. 4.

4

clarifications" need be mentioned here. First, Spaid asserts that Deputy Gross had arrested him only once for drug use. Spaid does not provide any citation or evidence to support this assertion, and Deputy Gross testified that he had arrested Spaid twice before for drug use. T. 34–35. This factual clarification is overruled. Second, Spaid asserts without any citation to the record that Deputy Gross testified that 1720 East Capitol was "not considered a drug house." Doc. 58 at 2. This assertion is wrong and is overruled. Deputy Spaid testified that 1720 East Capitol Avenue is a duplex and that both 1720 and the residence attached to it are suspected drug houses. T. 29–30. Spaid's remaining clarifications are either irrelevant or addressed by this Court's factual findings and legal analysis.

III. Analysis

   A. Initial Traffic Stop

A traffic stop is a "seizure" under the Fourth Amendment and must be supported by probable cause or reasonable suspicion. United States v. Gordon, 741 F.3d 872, 876 (8th Cir. 2013). Probable cause for a traffic stop exists "[a]s long as an officer objectively has a reasonable basis for believing that the driver has breached a traffic law." Id. (alteration in original ) (quoting United States Coney, 456 F.3d 850, 856 (8th Cir. 2006)). This is true even when the traffic violation is minor and the stop is simply "a pretext for other investigation." United States v. Payne, 534 F.3d 948, 951 (8th Cir. 2008); see also Whren v. United States, 517 U.S. 806, 813 (1996) (explaining that Supreme Court precedent "foreclose[d] any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved"). The less-rigorous standard of reasonable suspicion "exists when an 'officer is aware of particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed.'"

Gordon, 742 F.3d at 876 (internal marks omitted) (quoting United States v. Hollins, 685 F.3d 703, 706 (8th Cir. 2012)). The Fourth Amendment requires that police officers be reasonable, not perfect. Heien v. North Carolina, 135 S. Ct. 530, 536 (2014). Thus, grounds for a traffic stop may rest on an officer's mistake of fact or law, provided that the mistake is objectively reasonable. Id. at 536–39; United States v. Hollins, 685 F.3d 703, 706 (8th Cir. 2012).

Here, the deputies pulled Spaid over for violating SDCL § 32-26-18.1 when he failed to signal his turn onto Garfield Street and for violating SDCL § 32-26-6 when he twice crossed the center line. Judge Moreno concluded that Spaid crossing the center line twice provided the deputies with probable cause for the stop; that even if the deputies were mistaken about Spaid's traffic violations they still had probable cause because their mistakes were reasonable; and that even if the traffic violations were not enough to justify the stop by themselves, the totality of the circumstances gave the officers reasonable suspicion. Spaid argues that he did not violate any traffic laws, that the deputies' conclusion that he did was unreasonable, and that the totality of the circumstances show that the deputies lacked reasonable suspicion.

This Court agrees with Judge Moreno that the deputies had a reasonable basis for stopping Spaid. Section 32-26-6 reads in relevant part: "On a roadway divided into lanes, a vehicle shall be driven as nearly as practicable entirely within a single lane and may not be moved from such lane until the driver has first ascertained that such movement can be made with safety." SDCL § 32-26-6. The Supreme Court of South Dakota held that an officer had reasonable suspicion that a defendant violated § 32-26-6 when the officer saw the defendant cross over the fog line "by at least a tire width" and it was practicable for the defendant to remain entirely within his lane. State v. Hett, 834 N.W.2d 317, 323 (S.D. 2013). Similarly, the Eighth Circuit held that a trooper had probable cause to stop a vehicle for violating § 32-26-6 when the

passenger side wheels of the suspect's car crossed the fog line one time. United States v. Herrera Martinez, 354 F.3d 932, 933–34 (8th Cir. 2004) (per curiam), vacated on other grounds, 546 U.S. 1164 (2007). And courts applying statutes very similar to § 32-26-6 have held that officers had an objectively reasonable basis for a stop when a suspect crossed the fog line once for ten to fifteen seconds in good driving conditions, United States v. Herrera-Gonzalez, 474 F.3d 1105, 1110–11 (8th Cir. 2007), when a suspect crossed the fog line once by "about a foot . . . for a few seconds" and there were no factors making it impractical for the suspect to remain in a single lane, United States v. Alvarado, 430 F.3d 1305, 1308–09 (10th Cir. 2005), and when the right wheels of the suspect's car crossed over the fog line once for two seconds and it was practicable for the suspect to remain entirely within his lane, State v. Wolfer, 780 N.W.2d 650, 652–53 (N.D. 2010).

Here, both deputies testified that Spaid crossed the center line twice and Judge Moreno found that this testimony was credible. Doc. 54 at 8. Although Spaid argues that the video of the traffic stop undermines the deputies' testimony and shows that he never crossed the center line, this Court disagrees. True, the relatively poor quality of the video and the distance between Spaid's truck and the deputies' patrol car make it difficult at times to tell whether Spaid crossed over the center line or was merely driving right up against it. See Ex. 3 at 16:32:34–16:33:38. But the video falls short of establishing that Spaid never crossed the center line and therefore does not justify disregarding Judge Moreno's credibility determination. See United States v. Walker, 555 F.3d 716, 720 (8th Cir. 2009) (declining to reverse district court's finding that an officer's testimony was credible where the officer testified that he observed a possible altercation in a car and the video the defendant claimed undermined this testimony was inconclusive). In fact, the deputies' testimony is consistent with Deputy Gross's statements to Spaid on the video;

7

while Spaid was sitting in the patrol car, Deputy Gross told him that the deputies had pulled him over because he had crossed the center line. Ex. 3 at 16:40:43–53. The video also shows that it was practicable for Spaid to stay entirely within his lane: the road was dry, smooth, and relatively straight, there were no obstructions in Spaid's lane, and the center line was clearly marked. Ex. 3. Under these circumstances, the deputies had at least a reasonable suspicion that Spaid violated § 32-26-6 by crossing the center line twice.

In any event, this Court agrees with Judge Moreno that even if Spaid twice crossing the center line was not enough to justify the stop, the totality of the circumstances gave the deputies reasonable suspicion. The deputies observed Spaid, whom Deputy Gross had twice arrested for drug use, leave a suspected drug house and start driving his truck. Spaid stopped his vehicle to the left of the center line on Capitol Avenue and then twice crossed the center line while driving on Garfield Street. Deputy Gross testified that crossing the center line can be an indication that the driver is impaired. T. at 47, 53–54. Although a suspect's criminal history and presence at a drug house is not enough by itself to create reasonable suspicion, United States v. Spears, 636 F. App'x 893, 899 (5th Cir. 2016); United States v. Santos, 403 F.3d 1120, 1132 (10th Cir. 2005), the totality of the circumstances here—namely, Spaid's prior drug arrests, visit to the suspected drug house, and his driving after leaving the house—gave the deputies reasonable suspicion to stop him.[3]

---

[3]Judge Moreno held that it was reasonable for the deputies to concluded that Spaid violated SDCL § 32-26-18.1 when he failed to signal his turn onto Garfield Street. Doc. 54 at 11. Spaid objects to this holding, arguing that SDCL § 32-26-22 shows that he was not required to use his turn signal. Because reasonable suspicion to stop Spaid existed even without considering Spaid's failure to signal his turn, this Court need not decide whether the deputies reasonably suspected Spaid of violating § 32-26-18.1. Judge Moreno also found that Spaid's failure to heed the deputies' emergency lights after seeing them in his mirror contributed to the deputies having reasonable suspicion for the stop. Doc. 54 at 12. Spaid argues that Judge Moreno should not have considered this factor because it occurred after the officers had initiated the stop. Without

8

### B. Extension of Traffic Stop

Spaid argues that the deputies unlawfully extended the traffic stop beyond the time necessary to ticket him for a lack of insurance. According to Spaid, this unlawful extension began when Deputy Gross entered the patrol car to speak with him. Doc. 58 at 10. A traffic stop should only last long enough to complete the purpose of the stop. Rodriguez v. United States, 135 S. Ct. 1609, 1614 (2015). Although the primary purpose of a traffic stop is to "address the traffic violation that warranted the stop," officers may also conduct "incident[al]" inquiries such as running a warrant check on the driver and inspecting the driver's license, registration, and proof of insurance. Id. at 1615. Absent reasonable suspicion that other criminal activity is afoot, an officer's authority for conducting a traffic stop "ends when tasks tied to the traffic violation are—or reasonably should have been—completed." Id. at 1614. But when an officer "discovers information leading to reasonable suspicion of an unrelated crime," he "may extend the stop and broaden the investigation." United State v. Woods, 829 F.3d 675, 679 (8th Cir. 2016).

This Court finds that the deputies had a legitimate basis for extending the traffic stop at each step along the way. Deputy Gross had reasonable suspicion of criminal activity apart from the lack of insurance by the time he joined Spaid in the patrol car. Spaid, whom Deputy Gross had twice arrested for drug use, had just come from a suspected drug house. He stopped his truck to the left of the center line on Capitol Avenue, twice crossed the center line on Garfield

---

specifically discussing whether conduct occurring after the police have initiated a stop can support reasonable suspicion to justify the stop in the first place, the Eighth Circuit in Walker relied in part on the suspect's failure to pull over immediately when finding that an officer had reasonable suspicion to stop the suspect. 555 F.3d at 720–21. The deputies had reasonable suspicion to stop Spaid regardless of whether this Court considers Spaid's failure to stop sooner after seeing the emergency lights.

Street, continued driving after seeing the deputies behind him with their overhead lights flashing, and made a left turn into Runnings rather than pulling to the right. In Deputy Gross's experience, crossing the center line suggests that a driver could be impaired and delaying to stop promptly when being pulled over indicates that the driver may be attempting to hide contraband. T. 14,15, 47, 53–54, 65. When Spaid was in the vehicle with Deputy Sack, he appeared agitated and "fidgety." T. 76. He also told Deputy Sack that he was coming from the courthouse when in fact he had just come from a suspected drug house. Taken together, these circumstances justified extending the traffic stop so that Deputy Gross could investigate further.

The deputies' basis for detaining Spaid and expanding the scope of the stop grew very quickly once Deputy Gross joined Spaid in the patrol car. Indeed, Deputy Sack observed the marijuana pipe in Spaid's truck less than a minute after Deputy Gross began speaking with Spaid. The marijuana pipe, along with all the other circumstances, not only gave the deputies ground to detain Spaid even longer, but also provided probable cause to search Spaid's truck under the automobile exception. See United States v. Ross, 456 U.S. 798, 825 (1982) (explaining the automobile exception); United States v. Walker, 840 F.3d 477, 483–84 (8th Cir. 2016) (holding that odor of unburned marijuana coming from the suspect's car provided a basis to further detain the suspect as well as probable cause to search the car); United States v. Guy, 1 F. App'x 410, 413 (6th Cir. 2001) (concluding that a police officer's discovery of the suspect asleep in his car holding a methamphetamine pipe provided probable cause to search the car under the automobile exception). And the suspicious circumstances did not end with the marijuana pipe. After Deputy Sack observed the pipe, Spaid failed a field sobriety test and the deputies found the dugout containing marijuana. In sum, Deputy Gross joining Spaid in the patrol car and the deputies' detention of Spaid thereafter did not illegally extend the traffic stop.

10

Spaid also takes issue with Deputy Sack seeing the marijuana pipe while petting the dog. Judge Moreno concluded that Deputy Sack reaching into the truck to pet the dog was a de minimis intrusion that did not constitute an unreasonable search. Spaid argues that the intrusion was more than de minimis because the deputies were peering through his windows continuously for the first ten minutes of the stop but were unable to see the pipe until Deputy Sack positioned himself to pet the dog.

Although a vehicle's interior "is not subject to the same expectations of privacy that exist with respect to one's home," it "is nonetheless subject to Fourth Amendment protections from unreasonable intrusions by the police." New York v. Class, 475 U.S. 106, 114–115 (1986). Thus, an intrusion into a vehicle's interior can constitute a search. Id. at 115. In Class, for instance, the Supreme Court found that an officer conducted a search under the Fourth Amendment when he opened a car door and reached into the interior of the vehicle to move some papers obscuring the VIN. Id. at 108, 115. Similarly, the Fifth Circuit in United States v. Ryles, 988 F.2d 13 (5th Cir. 1993), held that a trooper who either opened a car door or stuck his head inside the car's open window had performed a search because he had "intruded inside a space that, under most circumstances, is protected by a legitimate expectation of privacy." Id. at 15.

But the Fourth Amendment privacy interest in a vehicle's interior is not absolute. A motorist does not have a reasonable expectation of privacy in areas within his vehicle that are visible from the outside. Texas v. Brown, 460 U.S. 730, 740 (1983) (plurality opinion) ("There is no legitimate expectation of privacy shielding that portion of the interior of an automobile which may be viewed from outside the vehicle by either inquisitive passersby or diligent police officers) (internal citations omitted); Class, 475 U.S. at 118 (explaining that locations inside a

11

vehicle that are in plain view of people outside the vehicle are not "subject to a reasonable expectation of privacy"); United States v. Hatten, 68 F.3d 257, 261 (8th Cir. 1995) (explaining that a suspect with transparent windows did not have a reasonable expectation of privacy in the "visible interior of his car"). Thus, when a vehicle is lawfully stopped, an officer who merely looks through a vehicle's window from the outside has not searched the vehicle within the meaning of the Fourth Amendment. Brown, 460 U.S. at 740; United States v. Ware, 914 F.2d 997, 1000 (7th Cir. 1990) ("[T]here is no expectation of privacy and thus no 'search' when a person merely observes something through an automobile's window."); United States Martin, 806 F.2d 204, 206–07 (8th Cir. 1986) (holding that agent's viewing of gun parts while looking through the window of a car did not constitute a search). That an officer looking through a vehicle's window may have shifted his position or "'bent down at an angle so he could see what was inside' is irrelevant to Fourth Amendment analysis." Brown, 460 U.S. at 740 (internal alterations and citation omitted).

Here, the marijuana pipe was in plain view on the front seat of Spaid's truck. Deputy Sack could see the pipe through the open window without leaning inside. Although Deputy Sack was reaching his hand slightly into the truck to pet the dog when he saw the pipe, this did not facilitate his viewing of the pipe in any way. He did not move anything inside the truck or use his hand to gain a better vantage point. In fact, the video shows that Deputy Sack's head remained at least a foot back from the window when he was petting the dog. Ex. 3 at 16:38:40–16:39:22. Although Spaid asserts that the deputies were continuously peering into his car and were only able to see the pipe when Deputy Sack positioned himself to pet the dog, this is incorrect. The deputies were not peering into Spaid's truck continuously and Deputy Sack's walking up to pet the dog was the first time after Spaid exited the truck that one of the deputies

12

looked in the driver's side window. Ex. 3 at 16:34:25–16:38:44. Deputy Sack's viewing of the pipe through the open window was not a search under the Fourth Amendment because Spaid did not have a reasonable expectation of privacy in the visible interior of his car. Brown, 460 U.S. at 740. That Deputy Sack happened to be reaching his hand slightly into Spaid's truck to pet a dog at the same time he viewed the pipe does not justify holding otherwise.

But even if Deputy Sack's reaching his hand slightly into the truck to pet a dog constitutes a search, that search was reasonable. See Maryland v. Buie, 494 U.S. 325, 331 (1990) ("It goes without saying that the Fourth Amendment bars only unreasonable searches and seizures."). Courts look to the purpose behind an officer's actions when determining whether a search was unreasonable. See Ryles, 988 F.2d at 15–16 (holding that trooper placing his head inside a vehicle or opening a vehicle's door was not an unreasonable search because the trooper had just discovered that the driver was unlicensed and possibly intoxicated and was trying to determine whether one of the vehicle's passenger could drive the vehicle). The only reason Deputy Sack reached his hand slightly into Spaid's truck was to pet a small dog that had been barking throughout the stop. Again, Deputy Spaid reaching into the truck did not facilitate his viewing of the marijuana pipe in any way. Given the purpose behind Deputy Sack's actions and the nonintrusive nature of Deputy Sack reaching his hand slightly through the open window of Spaid's truck, Deputy Sack's "search" was reasonable.

### C. Fruit of the poisonous tree

Spaid argued unsuccessfully to Judge Moreno that the evidence taken from his person, truck, and residence should be suppressed as fruit of the poisonous tree. See Wong Sun v. United States, 371 U.S. 471 (1963). Spaid now objects to Judge Moreno's recommendation to

the contrary. Because the deputies did not violate the Fourth Amendment, Spaid's fruit-of-the-poisonous-tree argument fails.

**IV. Conclusion**

For the reasons stated above, it is hereby

ORDERED that Defendant's Objections to the Report and Recommendation, Doc. 58, are denied. It is further

ORDERED that the Report and Recommendation, Doc. 54, is adopted. It is finally

ORDERED that Defendant's Motion to Suppress, Doc. 37, is denied.

DATED this 27th day of October, 2017.

BY THE COURT:

_____
ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE